Joseph J. MACKTAL, Jr., Petitioner,

v.

**SECRETARY OF LABOR, Respondent.**

No. 90–4029.

United States Court of Appeals, Fifth Circuit.

Feb. 20, 1991.

Stephen M. Kohn, Kohn, Kohn & Colapinto, Washington, D.C., for petitioner.

Ellen L. Beard, Steven J. Mandel, Elizabeth Dole, Secretary of Labor, U.S. Dept. of Labor, Washington, D.C., for respondent.

Richard K. Walker, Nicholas S. Reynolds, Winston & Strawn, Washington, D.C., for intervenor, Brown & Root, Inc.

Before WISDOM, GEE, and HIGGINBOTHAM, Circuit Judges.*

WISDOM, Circuit Judge:

Joseph J. Macktal, Jr. filed a complaint with the Secretary of Labor (the Secretary) under section 210 of the Energy Reorganization Act of 1974.[1] In the complaint, he alleged that his employer, Brown & Root, Inc., discharged him because he identified potential problems in the construction of the Comanche Peak nuclear power plant. After Macktal filed his complaint, he and Brown & Root agreed to settle the dispute underlying the complaint and asked the Secretary to dismiss the complaint. After striking one provision, the Secretary approved the settlement and dismissed the complaint. Macktal appeals. We have jurisdiction under 42 U.S.C. § 5851(b). We vacate the order of the Secretary and remand for further consideration.

I

Macktal began work with Brown & Root in January of 1985 as a journeyman electrician. While with Brown & Root, Macktal worked on the Comanche Peak nuclear power plant. Between October 1985 and January 1986, Macktal made six visits to SAFETEAM, Brown & Root's in-house program that investigated technical safety concerns identified by employees.

On January 2, 1986, Brown & Root gave Macktal a conference report concerning excessive absenteeism. The report identified a total of fifteen days of absence or "early out" departures during 1985, including five

---

* This opinion was concurred in by Judge Gee prior to his resignation from the Court on February 1, 1991.

1. Pub.L. No. 93-438, 88 Stat. 1233 (codified at 42 U.S.C.A. § 5851 (West 1983)).

during the month of December.[2] The next day Macktal gave his supervisor a written response in which Macktal asserted that Brown & Root was applying the absentee policy more strictly against him because of his identification of safety problems. His response stated that he believed he was being harassed by Brown & Root management "because [he] revealed conditions that could affect the safe operation and shut-down of CBSES Unit II"; that is, in the vernacular, he was harassed because he was a whistle-blower.

In the final paragraph of the response, Macktal wrote:

In an effort to preserve my mental health and avoid any further harassment, I wish to be relieved of my duties until the TEC, NLRB, NRC can resolve these matters.

Brown & Root took this final paragraph as a resignation and escorted Macktal off-site.

One month later, Macktal filed a complaint with the Secretary, under section 210 of the Energy Reorganization Act of 1974, alleging that he was constructively discharged because of his whistle-blowing activity.

After a preliminary determination by the Wage and Hour Division that Macktal's claim lacked merit, Macktal requested a hearing before an administrative law judge (the "ALJ"). On November 18, 1986, the day of the scheduled hearing, the ALJ encouraged Macktal and Brown & Root to settle. The attorneys for the two parties conducted negotiations throughout the day and reached an oral agreement. During these negotiations, the attorneys would take occasional breaks to discuss the progress of the negotiations with their respective clients. Macktal admits that he agreed to settle his case for $35,000[3] "after considerable pressure" from his own attorneys.[4]

A written settlement agreement and two versions of a general release followed in January of 1987. Macktal's attorneys signed the settlement agreement on behalf of Macktal. Soon thereafter, Macktal signed two versions of a general release as required by the settlement. The general release covered "any and all liability arising out of or relating to Mr. Macktal's employment with Brown & Root". Macktal has stated in his affidavit that his attorneys used the settlement they signed on his behalf to coerce Macktal into signing the general release.

The settlement contained a number of other terms, including a confidentiality agreement and Brown & Root's agreement not to convey its dissatisfaction with Macktal to any of Macktal's future prospective employers. While most of the other terms are not relevant for the purpose of this appeal, one is: paragraph 3.

In paragraph 3 of the agreement, Macktal agreed not to appear voluntarily as a witness in any administrative or judicial proceeding concerning the safe operation of the Comanche Peak plant. He also agreed to take reasonable steps to resist a subpoena requiring his testimony at such proceeding. In addition, his original counsel agreed not to call Macktal as a witness, and not to do or say anything that might encourage another to call Macktal as a witness, in such proceedings.

Based on the settlement, the two parties made a joint motion to dismiss which motion the ALJ recommended the Secretary grant.[5] Instead of granting the motion to

---

2. Brown & Root has a written policy on absenteeism. "An employee may be subject to termination if he/she misses three (3) days of work during a thirty (30) day period. The same applies to tardiness and early outs."

3. Brown & Root was to issue a check for $35,000 jointly to Macktal and his attorneys. Of the $35,000, Macktal received $15,000 and his attorneys received $20,000. Brown & Root denies any knowledge of the nature of the division of the settlement proceeds between Macktal and his counsel.

4. Macktal had asked the Secretary to review the alleged misconduct by his original attorneys. He subsequently withdrew these allegations. As a result, when the Secretary asked Macktal's original attorneys to respond to his allegations, they would not because of the confidentiality of the lawyer-client relationship.

5. Under the relevant regulations, the ALJ had the authority only to make a recommendation to the Secretary concerning the final disposition of the case. The Secretary retained the authori-

dismiss, the Secretary asked for a copy of the settlement agreement. Brown & Root and Macktal's original attorneys refused to provide the settlement agreement and asked the Secretary to reconsider the order. Eventually, Macktal, through new counsel, learned of the Secretary's order and delivered a copy of the settlement agreement to the Secretary. Macktal asked the Secretary to disapprove the settlement. Brown & Root opposed Macktal's request.

The Secretary issued an order severing paragraph 3 of the settlement agreement as contrary to public policy, but otherwise upholding the settlement, and dismissed the action. Macktal appeals.

## II

We begin with the statutory language. Section 210 provides:

(b) **Complaint, filing and notification**

(1) Any employee who believes that he has been discharged or otherwise discriminated against by any person [on account of whistle-blowing] may, within thirty days after such violation occurs, file (or have filed on his behalf) a complaint with the Secretary of Labor [ ("Secretary") ] alleging such discharge or discrimination. Upon receipt of such a complaint, the Secretary shall notify the person named in the complaint of the filing of the complaint and the Commission.

(2)(A) Upon receipt of a complaint filed under paragraph (1), the Secretary shall conduct an investigation of the violation alleged in the complaint. Within thirty days of the receipt of such complaint, the Secretary shall complete such investigation and shall notify in writing the complainant (and any person acting in his behalf) and the person alleged to have committed such violation of the results of the

investigation conducted pursuant to this subparagraph. Within ninety days of the receipt of such complaint the Secretary shall, unless the proceeding on the complaint is terminated by the Secretary on the basis of a settlement entered into by the Secretary and the person alleged to have committed such violation, issue an order either providing the relief prescribed by subparagraph (B) or denying the complaint. An order of the Secretary shall be made on the record after notice and opportunity for a public hearing. The Secretary may not enter into a settlement terminating a proceeding on a complaint without the participation and consent of the complainant.[6]

Once a complaint is filed, the statutory language authorizes only three options: (1) an order granting relief; (2) an order denying relief; or (3) a consensual settlement involving all three parties. The Secretary has published regulations detailing the procedures she will follow to determine which of these three options she will choose. Under the regulations, the Wage and Hour Division conducts an investigation and makes a preliminary determination of the merits of the complaint.[7] If either party disputes the initial finding of the Wage and Hour Division, the regulations provide for an adversary hearing before an ALJ.[8] In this hearing, each side presents arguments and evidence.[9] Based on the hearing, the ALJ issues a recommended decision.[10]

■ Perhaps because the Secretary selected this adversarial format for the required public hearing, the parties use analogies to civil litigation to determine the appropriate extent of the Secretary's authority. While such analogies may be helpful, an analogy cannot give the Secretary authority withheld by the words of the statute, nor can analogies deprive the Secretary of authority provided by the words of the statute. Thus, Brown & Root's ar-

---

ty to issue the final order. 29 C.F.R. § 24.6 (1990).

**6.** 42 U.S.C.A. § 5851(b) (West 1983).

**7.** 29 C.F.R. § 24.4 (1990).

**8.** 29 C.F.R. § 24.5 (1990).

**9.** *Id.*

**10.** 24 C.F.R. § 24.6 (1990).

gument that the Secretary has no "jurisdiction" over the complaint once Brown & Root and Macktal filed a joint motion to dismiss must be rejected. The words of the statute require the Secretary to take one of three actions once a complaint is filed.[11] The statute makes no exception for cases in which the complainant and the company reach an independent settlement.

■ Also using the analogy, the Secretary likens her role to that of a judge and argues that she can sever terms that violate public policy, and enforce the remainder of the settlement, as if she were a court asked to enforce a private contract containing terms that violate public policy.[12] The Secretary's position contains two component arguments. First, she argues that she can allow the complainant and the company to negotiate a settlement and then approve the settlement if it adequately protects the public's interest and equitably treats the employee. Second, she argues that she can strike provisions of the negotiated settlement that are contrary to the public's interest without the consent of the other two parties. She reminds us that we must uphold her interpretation if it is rational and consistent with the statute.[13]

We agree with the Secretary's first argument that she may "enter into" a settlement by approving a settlement negotiated and agreed to by the parties. Her approval of the settlement, in effect, demonstrates her consent to the settlement and achieves the consent of all three parties, as required by the statute. However, using the label "approval" for her actions, or the analogy to civil litigation, should not confuse us as to the nature of her authority.

If the Secretary does not issue one of the two authorized orders, the statute permits the Secretary to terminate a complaint only by entering into a settlement. The only reasonable interpretation we can give the words chosen by Congress[14] is a consensual settlement process involving all three parties. We cannot reasonably interpret the "enter into a settlement" language to authorize the Secretary to dictate the terms of the settlement or to force a modified settlement on the complainant and the company. Indeed, such power would be the antithesis of the consensual settlement process contemplated by the statute. Because her authority is limited to entering into a settlement, her position in considering a negotiated settlement is either to consent, or not to consent, to the settlement as written. We must, therefore, reject, as inconsistent with the statute, the Secretary's second argument that she can strike certain terms, and enforce the remainder, of a settlement without the consent of both the complainant and the company. If the Secretary wants to modify material terms of the negotiated settlement, she must obtain the consent of the other two parties to her proposed modifications.

11. The statute provides:

Within ninety days of the receipt of such complaint the Secretary *shall,* unless the proceeding on the complaint is terminated by the Secretary on the basis of a settlement entered into by the Secretary and the person alleged to have committed such violation, issue an order either providing the relief prescribed by subparagraph (B) or denying the complaint. 42 U.S.C.A. § 5851(b) (West 1983) (emphasis added).

12. For a discussion of a court's role in severing contractual terms on the grounds of public policy, see Restatement (Second) of Contracts §§ 178–185 (1981).

13. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).

14. A "settlement entered into by the Secretary and the person alleged to have committed such violation ... [with] the participation and consent of the complainant". 42 U.S.C.A. § 5851(b) (West 1983). Starting with an analogy to civil litigation, the Secretary argues that Congress misapprehended the proper role of the Secretary under the statute. The Secretary argues that because she selected an adversarial format for the required public hearing, she should be considered an "adjudicator", rather than a party. We do not understand this reasoning. The authority of the Secretary begins with the words of the statute, and the question we must ask is whether the authority she claims is consistent with those words. *Cf. NLRB v. United Food & Commercial Workers Union,* 484 U.S. 112, 123, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987). We will not rewrite the words of the statute so that they are consistent with the authority claimed.

In *Evans v. Jeff D.*,[15] the Court considered a similar question in the class action context. The case involved a class of emotionally and mentally handicapped children seeking injunctive relief for alleged deficiencies in the education and care of these children by the State of Idaho.[16] The class did not seek damages, but did request costs and attorney's fees. Prior to trial, the defendants offered to settle. The offer included broad injunctive relief, broader than the plaintiffs could hope to win at trial, but required the plaintiffs to waive their right to attorney's fees.[17] The district court, acting under Rule 23(e), approved the settlement.[18] The Court of Appeals affirmed the injunctive relief portions of the settlement, but rejected the fee waiver.[19] Its ruling essentially modified a material term of the settlement without the parties' consent.

The Supreme Court rejected the position of the Court of Appeals:

> Rule 23(e) wisely requires court approval of the terms of any settlement of a class action, but the power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed. Although changed circumstances may justify a court-ordered modification of a consent decree over the objections of a party after the decree has been entered, and the District Court might have advised petitioners and respondents that it would not approve their proposal unless one or more of its provisions was deleted or modified, Rule 23(e) does not give the court the power, in advance of trial, to modify a proposed consent decree and order its acceptance over either party's

objection. The options available to the District Court were essentially the same as those available to respondents: it could have accepted the proposed settlement; it could have rejected the proposal and postponed the trial to see if a different settlement could be achieved; or it could have decided to try the case.[20]

If we apply this analysis to the Secretary's authority to enter into settlement agreements, we must conclude that the Secretary can either approve the Brown & Root–Macktal settlement as it was written, obtain the consent of the other two parties to a modified settlement, or reject the settlement. Similarly, the Secretary cannot take the negotiated settlement, strike terms she does not like, and then impose it on the parties.

In *Thompson v. United States Department of Labor*,[21] the Ninth Circuit considered the Secretary's authority to modify a settlement between the parties under section 210. In that case, the parties reached a settlement, but the settlement was silent as to "any dismissal of claims".[22] The Secretary approved the settlement and dismissed the case with prejudice.[23] The Ninth Circuit reversed: "The Secretary's power to approve settlement agreements does not include the power to force employees to accept a settlement. The Secretary's dismissal with prejudice added a material condition to the parties' agreement, and provided APS with a benefit it was unable to secure by negotiation."[24]

■ We agree with this analysis. Under section 210, the Secretary cannot force either the complainant or the company to accept a settlement. Severing paragraph 3 eliminated a material term of the agree-

**15.** 475 U.S. 717, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986).

**16.** 475 U.S. at 720–21, 106 S.Ct. at 1534.

**17.** 475 U.S. at 722, 106 S.Ct. at 1535.

**18.** 475 U.S. at 723–24, 106 S.Ct. at 1535.

**19.** 475 U.S. at 724, 106 S.Ct. at 1536.

**20.** 475 U.S. at 726–27, 106 S.Ct. at 1537 (footnotes omitted).

**21.** 885 F.2d 551 (9th Cir.1989).

**22.** 885 F.2d at 556.

**23.** 885 F.2d at 556.

**24.** 885 F.2d at 557.

ment.[25] This the Secretary cannot do without the consent of the other two parties.

Although we recognize the varying equities involved, the Secretary, on remand, may either consent to the settlement, as written, or not. If the Secretary does not consent to the settlement, as written, she may either negotiate a new settlement with the parties (or allow the parties to negotiate a new settlement and then consent to it) or hold a hearing to determine which of her two authorized orders she will issue.

## III

■ Macktal raises three other arguments. First, he argues that he withdrew his consent before the Secretary consented to the settlement. Second, he argues that he did not consent to the settlement agreement at the time it was negotiated. Third, he argues that if he did consent, his consent was not voluntary but was coerced by his own attorneys.[26] We address these issues because they will remain on remand.

■ In response to Macktal's first point, the Secretary argues that Macktal's consent at the time of the Secretary's review of the settlement is irrelevant. She argues that so long as Macktal consented initially to the settlement he cannot withdraw his consent before she completes her review of the settlement. To support her position, the Secretary cites several cases addressing the issue in the context of settlements requiring court approval.[27] Unless the words of the statute unambiguously require a contrary interpretation, we must uphold the interpretation of the Secretary "as long as [it is] rational and consistent with the statute." [28]

The "participation and consent" language derives from a similar provision in the Safe Drinking Water Act.[29] Congress required the participation and consent of the complainant to ensure that the Secretary did not compromise the complainant's interest in her settlement with the company.[30] The Secretary decided not to participate in the initial settlement negotiations; rather she permitted the complainant and the company to negotiate the initial terms of a settlement. Once they have reached agreement, then she may consent to the agreement if it protects the interests of the public and the complainant. The process selected by the Secretary necessarily en-

---

**25.** Consistent with the consensual settlement required by the words of the statute, we define a "material term" to be a term that a party could not customarily change in a private agreement without the consent of the other parties to the agreement. In her decision, the Secretary struck paragraph 3, while enforcing the rest of the agreement, because it was not "essential" within the meaning of section 184 of the Second Restatement of Contracts. *See* Restatement (Second) of Contracts § 184(1) (1981). Whether or not the paragraph is "essential" in that sense, the evidence requires a finding that paragraph 3 is not so unimportant that a party could add it to, or delete it from, a settlement agreement without the consent of the other parties.

**26.** Macktal also alleges that Brown & Root took advantage of his unemployment to force the settlement on him. We agree with the Secretary that financial hardship due to loss of employment does not constitute sufficient duress to void a settlement between the former employee and employer. *See, e.g., Jurgensen v. Fairfax County,* 745 F.2d 868, 889 (4th Cir.1984); *Asberry v. United States Postal Serv.,* 692 F.2d 1378, 1381 (Fed.Cir.1982).

**27.** *Interspace, Inc. v. Morris,* 650 F.Supp. 107, 109 (S.D.N.Y.1986); *Allen v. Alabama State Bd.*

*of Educ.,* 612 F.Supp. 1046, 1053–54 (M.D.Ala. 1985), *aff'd,* 816 F.2d 575 (11th Cir.1987); *George v. Parry,* 77 F.R.D. 421, 423 (S.D.N.Y.), *aff'd without op.,* 578 F.2d 1367 (2d Cir.), *cert. denied,* 439 U.S. 947, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978).

**28.** *NLRB v. United Food & Commercial Workers Union,* 484 U.S. at 123, 108 S.Ct. at 421; *see also INS v. Cardoza–Fonseca,* 480 U.S. 421, 446–48, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987); *Chevron U.S.A., Inc.,* 467 U.S. at 842–43, 104 S.Ct. at 2781.

**29.** 42 U.S.C.A. § 300j–9(i) (West 1982).

**30.** As explained by Representative Symington, cosponsor of the amendment adding the language to the Safe Drinking Water Act:

This addition dealing with settlements is important because the Labor Department has found, in the cases it has been involved with thus far, that as the cases near the final steps of the machinery there is a tendency for settlements to be entered into. It is important that we guarantee by statute that the employee's interests not be compromised in these situations.

102 Cong.Rec. 36393 (1974).

tails some delay between the time the parties initially negotiate, and consent to, a settlement and her approval of the settlement. She argues that she can bind the complainant and the company to their initial consent until she has time to approve or reject the settlement.

We must agree with the Secretary. The statute requires the participation and the consent of the complainant. But, assuming that Macktal participated in and consented to the settlement at the time it was negotiated, the statute does not explicitly require a second affirmation of consent at the time the Secretary approves the settlement. Given their participation in the negotiation of, and their consent to, the initial settlement, we see nothing wrong with the Secretary holding the complainant and the company to their initial consent until she has time to review the settlement. The requirement of an initial consent by the complainant adequately protects the interest of the complainant and ensures that the Secretary and the company will not negotiate a settlement contrary to the interests of the complainant. Furthermore, binding the parties to their initial consent permits the settlement process to proceed more smoothly, without fear that one or the other parties will withdraw from the negotiated settlement before the Secretary can complete her review.

■ Macktal's second point is that he did not consent to the settlement. The Secretary found that Macktal did consent to the settlement. We will reverse this finding only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."[31] Under federal law,[32] an oral agreement to settle is binding.[33] Macktal admits in his affidavit that he agreed, on November 18, 1986, to the oral settlement agreement reached by his attor-

neys on that date. He also signed two versions of a general release in January of 1987 and accepted his share of the proceeds under the settlement agreement. Given these indications of consent, we cannot conclude that the Secretary's finding of consent is an abuse of discretion.

■ In his third point, Macktal argues that pressure exerted by his attorneys to accept the settlement voids his consent. Macktal alleges that his attorneys threatened to withdraw from representation and to charge Macktal $12,000 in fees if he did not consent to the November 18th oral settlement. He further alleges that, when the parties had reduced the terms of the settlement to writing in January, he refused to sign. He alleges that because he refused to sign, his attorneys signed on his behalf. According to Macktal, his attorneys then used the written settlement (that they had signed on his behalf) to bludgeon him into signing two versions of the general release. While recognizing that Macktal had alleged serious misconduct on the part of his own attorneys, the Secretary ruled that the alleged coercion by Macktal's counsel did not affect the validity of his consent to the settlement.[34]

The question, in this case, is whether arguments, even quite heated arguments, between a client and his attorney concerning the merits of settling voids the consent given by the client. Considering the ethical duties of an attorney to his client, the client's right to seek new counsel, and the availability of a direct action against the attorney, the Secretary concluded that Macktal, rather than Brown & Root, should bear the risk of his attorneys' alleged misconduct, and refused to void the settlement based on Macktal's allegations. We cannot

---

**31.** 5 U.S.C.A. § 706(2)(A) (West 1977); *see also Thompson,* 885 F.2d at 555.

**32.** The settlement involves a right to sue derived from a federal statute; federal law, therefore, governs the validity of the settlement. *See, e.g., Town of Newton v. Rumery,* 480 U.S. 386, 392, 107 S.Ct. 1187, 1192, 94 L.Ed.2d 405 (1987); *Fulgence v. J. Ray McDermott & Co.,* 662 F.2d 1207, 1209 (5th Cir.1981).

**33.** *See, e.g., Fulgence,* 662 F.2d at 1209.

**34.** The Secretary cited a number of cases from other areas supporting her position. *See Petty v. Timken,* 849 F.2d 130, 133 (4th Cir.1988); *Gilbert v. United States,* 479 F.2d 1267 (2d Cir. 1973).

say that this action constituted an abuse of discretion.

### IV

We hold that Macktal and Brown & Root have drafted and agreed to a settlement. Under Section 210, we hold that the Secretary may either enter into the settlement by approving it, or refuse to enter into it by rejecting it. She may not, however, modify material terms of the agreement without the consent of Macktal and Brown & Root. We VACATE the order of the Secretary and REMAND the case for further consideration consistent with this opinion.