Maxine McENANY, Plaintiff,

v.

WEST DELAWARE COUNTY COMMU-
NITY SCHOOL DISTRICT and Ste-
phen L. Swanson, Defendants.

No. C 92–2004.

United States District Court,
N.D. Iowa, E.D.

March 4, 1994.

Mark Zaiger, Shuttleworth & Ingersoll, Cedar Rapids, IA and Victoria Herring, West Des Moines, IA, for plaintiff.

Brian Gruhn, Mollman Wertz, Cedar Rapids, IA, for defendants.

## ORDER

JARVEY, United States Chief Magistrate Judge.

This matter comes before the court pursuant to defendants' July 23, 1993, motion to dismiss or in the alternative to enforce settlement agreement, for sanctions, and for attorney fees (docket number 21). The motion was amended November 19, 1993 (docket number 34). Plaintiff resisted the motion on August 27, 1993. An evidentiary hearing was conducted on November 19, 1993. The parties subsequently submitted further testimony by deposition transcript. The court has reviewed all testimony, arguments, and briefs of counsel. The motion is granted in part and denied in part.

### FINDINGS OF FACT

Plaintiff Maxine McEnany (McEnany) filed this suit on January 16, 1992. McEnany is the Business Manager and Secretary/Treasurer of the School Board of defendant West Delaware County Community School District (the District). McEnany's supervisor in her employment with the District is defendant Dr. Stephen L. Swanson (Swanson). In her complaint, McEnany alleges that defendants discriminated against her on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Equal Pay Act of 1963, 29 U.S.C. § 206(d). McEnany alleges discriminatory rate of pay, creation of a hostile work environment, and retaliation. McEnany has also brought pendent state law claims of sex discrimination in violation of Iowa Code Ch. 601A. McEnany

was represented by Attorney Mark Zaiger (Zaiger). Both the District and Swanson were represented by Attorney Brian Gruhn (Gruhn). On April 19, 1993, the parties consented to disposition of this matter by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

The present dispute arises out of mediated settlement negotiations among the parties held at the District's offices on June 16–17, 1993. Counsel for the parties first began discussions about mediation of the lawsuit during depositions in March of 1993. On or about March 11, 1993, the parties agreed that settlement negotiations should be mediated by a neutral third party.

Counsel for the parties agreed upon Attorney Peter Pashler (Pashler) as a mediator, and subsequently received the approval of their clients to approach Pashler about scheduling a mediation session.[1] Pashler had experience as a mediator while serving as executive director and mediator for the Iowa Public Employment Relations Board, as a mediator for other mediation services, and as a private mediator. Pashler has for several years been in private practice with the Des Moines law firm of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, P.C. All of the parties were familiar with Pashler from his appearances at seminars or public presentations, though none knew him personally, nor did he recall ever having met any of them prior to the mediation session.

McEnany and her counsel approved of the mediation session on the condition the defendants or their insurer would bear the costs. Defendants obtained approval from their insurance carrier, Employers Mutual Insurance, to pay a significant part of the costs of the mediation session, and defendants agreed to pay the rest.

Pashler does not recall who first contacted him about a mediation of the present dispute, but the mediation session was initially scheduled for April 27, 1993. Pashler requested a rescheduling of that mediation session for personal reasons and the mediation session

was reset for the evening of June 16, 1993, at the District's offices. Pashler chartered a flight to Manchester, Iowa, for the mediation session.

At the commencement of the evening, the parties signed a Mediation Agreement that provided, in pertinent part, that "if a settlement is reached, the Agreement shall be binding upon all parties to the Agreement." Pashler was to be paid an hourly rate for mediation, and the parties contemplated one continuous mediation session. Pashler also disclosed to counsel for the parties that his law firm had done various kinds of legal work, including bond work, for the District over the preceding ten years, but that he had not personally been involved in any of that legal work. Pashler asked if any of the parties objected to his mediation in light of his firm's contact with the District. No one objected to Pashler's mediation on the grounds of any conflict of interest based on his or his firm's activities. The parties, counsel, and the mediator then proceeded to a joint meeting.

Pashler explained his role to all parties in the joint meeting. Pashler stated that he would leave as soon as he perceived that the parties were not moving toward settlement. Pashler reiterated this statement to both sides separately during the course of the evening's negotiations. McEnany's counsel, Mark Zaiger, then presented an extensive outline of McEnany's case, what he believed he could prove on her behalf, and what damages and attorney fees he believed he could obtain if the case went to trial. Pashler testified that he learned everything he knew about the facts of the case from Zaiger's presentation to the Board.

Pursuant to the format the parties had agreed upon, the parties then separated and the mediation began. McEnany and her counsel sat in McEnany's office, while the Board and Swanson sat in another room across the hall. Pashler moved between the rooms, although he sometimes conferred with counsel for the parties in the hallway. Coun-

---

1. Plaintiff argues that she did not "assent" to the mediator. However, she testified that she sought and obtained Mr. Zaiger's advice on mediation. She agreed to the process and signed a media-

tion agreement. She never objected to Mr. Pashler's participation before the instant motion was filed.

sel for both sides agreed that Pashler could discuss matters directly with the parties and was not restricted to discussion with counsel. Both counsel indicated that they would ask Pashler to leave the caucus room if they wished to discuss matters privately with their clients. Both counsel made several such requests during the course of the evening. Over five hours of continuous negotiation followed, terminating after 1:00 a.m. the morning of June 17, 1993.

Pashler, Gruhn, and Zaiger all kept notes of the various negotiation sessions. All parties saw Pashler's notes and those notes formed the basis for all settlement negotiations. Pashler's notes reflect eleven negotiation sessions beginning with McEnany as the first and all subsequent odd-numbered sessions. Even-numbered sessions were with the District and Swanson. *See* Defendants' Exhibit C.[2]

Pashler's testimony regarding the nature and conduct of this mediation is corroborated by the court's own experience. Pashler's style reflects a relatively "pure" mediation philosophy in that he believes that mediation does not have to lead to settlement to be successful and that ordinarily the failure of a case to settle does not reflect negatively on the mediator. Rather, Pashler stated his belief that mediation has been successful if the parties have exhaustively explored the options for settlement and either achieved settlement or concluded that settlement is not possible. This is not to say, however, that Pashler does not pride himself on the high percentage of settlements that occur in his mediations.

Pashler's experience with the climate of mediations is similar to that experienced by the court. Heated exchanges between counsel and their clients, among co-parties, or between counsel or parties and the mediator are common. These events are often very stressful and contentious and it becomes the function of the mediator to make sure that dialogue points toward a resolution of the problem rather than an escalation of it. Without acrimony, there would be little need for a mediator. Decisions become more and more difficult for the parties as the session progresses. Strong convictions about and attachment to a case are often difficult to compromise. This difficulty often surfaces and must be handled by the mediator.

Pashler also stated his belief that often parties will settle shortly after the mediator indicates that he wants to leave.[3] Pashler favors one continuous mediation session because the parties frequently come back to the negotiations after with new demands.

Pashler testified that the mediation in this case was unusual because the parties contemplated McEnany's continued employment with the District. He was concerned that the relationship between the parties first be mended and future problems anticipated. He felt that money questions could be resolved later if non-monetary issues were settled first. McEnany demanded that her job description not be "watered down" in the future and wanted other job security. At some point, the parties agreed that a "facilitator" with school district experience should be available to the parties in the future to provide rapid resolution of previously unanticipated employment problems.

Thereafter, the negotiations concentrated on monetary issues, including McEnany's salary for 1992–93, her raise for 1993–94, back pay, and attorney fees. The parties initially discussed back pay and attorney fees as separate amounts, but later combined them because the District and Swanson wanted to negotiate a "package deal" that would leave it to plaintiff and her attorney to divide the proceeds.

After midnight, Pashler presented what was to be the defendants' last offer to McEn-

---

2. Plaintiff presented evidence to show that Pashler's notes have been fabricated. The court does not believe this evidence. Aside from simply believing Pashler on this point, no one gave even a hint as to what would motivate a person in Pashler's position to engage in such wildly corrupt activity.

3. This is perhaps one area where the court's opinion regarding mediation differs from Mr. Pashler's opinion. However, the court's greater patience is also a function of the fact that the court does not charge for mediation. Mr. Pashler testified to his desire to avoid wasting the parties' mediation fees when it appears that the process is not resolving the case.

any. Pashler testified that McEnany and her counsel discussed the offer in private for over twenty minutes before Zaiger invited Pashler into their caucus room. Zaiger said that there were problems with the offer and that Pashler should discuss them with McEnany. McEnany stated that she could never accept changes in the "chain of command" at her employment. McEnany and Zaiger then had an exchange during which Pashler describes Zaiger's manner as "directed," "emphatic," "blunt," and "speaking with some emotion." Zaiger told McEnany that he believed the facilitator would solve McEnany's concerns about job duties and security and that he did not believe that he could "do better for her," although he believed that he could get more attorney fees if the case went to trial. McEnany requested twenty-four hours to consider the offer, but the request was refused. After further discussion, and Zaiger's repeated assertion that he could not get a better settlement for McEnany, McEnany said, "I guess I better do what my attorney says." Pashler concluded that the parties had a settlement and went to communicate this to the defendants. Plaintiff states that Zaiger then told her that if she had not agreed, she would have been without counsel.

Counsel for the parties and Pashler then conferred in the hallway to make sure that they all had the same terms of the agreement. During their conference, McEnany left the building, saying goodnight to the mediator and counsel on her way out. Counsel for the parties and the mediator agreed that their notes all reflected the same essential terms and that the agreement could be reduced to writing during the following days. The mediation session then concluded.

Counsel for the parties subsequently exchanged drafts of a written agreement, culminating in a form McEnany's counsel stated was acceptable to McEnany. That final written form of the settlement agreement is embodied in Exhibit H. Several days after the mediation session, and after Exhibit H was exchanged between counsel, McEnany notified Zaiger that she did not accept the settlement and asked him to notify counsel for defendants of additional terms she insisted should be part of the settlement. Zaiger

expressed concern about her new demands that changed the deal that had been negotiated. He accurately predicted the outcome of the matter now before the court. McEnany employed Attorney Victoria Herring to contest the present motion to dismiss.

### CONCLUSIONS OF LAW

The District and Swanson argue that McEnany voluntarily and knowingly entered into a valid and enforceable settlement agreement at the end of the mediation session early on the morning of June 17, 1993. The District and Swanson argue that the oral nature of that agreement does not render it unenforceable. The District and Swanson also argue that McEnany's attorney had full authority to settle the case on McEnany's behalf. Finally, the District and Swanson argue that the settlement agreement settled all claims among the parties and that McEnany cannot now reject the settlement or demand new and different terms.

McEnany denies that any settlement was ever reached, or that if one was reached, she argues that she did not enter into it knowingly or voluntarily because the settlement was the result of coercion by her own attorney and the mediator. McEnany asserts that her attorney's further negotiation of a written agreement after conclusion of the mediation session was undertaken without her authority. McEnany also argues that there was no meeting of the minds on material terms of the settlement agreement. Finally, McEnany argues that the mediation session was fundamentally unfair because of conflicts of interest. McEnany alleges a conflict of interest on the part of opposing counsel who represented both the District and Swanson. She also alleges that the mediator was not neutral, but had a conflict of interest because his law firm had been employed by the District in the past.

### A. Whether A Valid Settlement Was Reached

■ A dispute concerning the existence or terms of a settlement agreement is a question of fact. *TCBY Systems, Inc. v. EGB Associates, Inc.*, 2 F.3d 288, 291 (8th Cir.1993); *see also Vaughn v. Sexton*, 975 F.2d 498, 506 (8th Cir.1992) (court's finding

of no settlement agreement was factual one). A district court "does not have the power ... to decide ... that a draft settlement agreement was binding when the parties did not agree on it." *Id.* at 290 (citing *Wang Lab., Inc. v. Applied Computer Sciences, Inc.*, 958 F.2d 355, 359 (Fed.Cir.1992)). However, the fact that " 'the parties left insubstantial matters for later negotiation, ... does not vitiate the validity of the agreement reached,' " *Trnka v. Elanco Products*, 709 F.2d 1223, 1226 n. 2 (8th Cir.1983), nor does the fact that the agreement had to be reduced to writing, if the parties agreed to all material terms. *Worthy v. McKesson Corp.*, 756 F.2d 1370, 1373 (8th Cir.1985).

■ To be valid, a party must give "knowing and voluntary" consent to a settlement agreement. *Alexander v. Gardner–Dever Co.*, 415 U.S. 36, 52 n. 15, 94 S.Ct. 1011, 1021 n. 15, 39 L.Ed.2d 147 (1974); *Worthy v. McKesson Corp.*, 756 F.2d 1370, 1372 (8th Cir.1985). Parties to a voluntary settlement agreement cannot avoid the agreement simply because the agreement ultimately proves to be disadvantageous. *Worthy, supra*, at 1373; *Trnka v. Elanco Products Co.*, 709 F.2d 1223, 1227 (8th Cir.1983).

"If a party to a Title VII suit who has previously authorized a settlement changes his mind ..., that party remains bound by the terms of the agreement." *Worthy, supra*, at 1373 (quoting with approval *Fulgence v. J. Ray McDermott & Co.*, 662 F.2d 1207, 1209 (5th Cir.1981)).

■ A settlement entered into by a party's attorney may be set aside if there is evidence that the attorney lacked the authority to settle the case on the party's behalf. *Id.*

Although an attorney is presumed to possess authority to act on behalf of the client, "a judgment entered upon an agreement by the attorney may be set aside on affirmative proof that the attorney had no right to consent to its entry."

*Kansas City Laborers Pension Fund v. Paramount Indus.*, 829 F.2d 644, 645 (8th Cir. 1987) (quoting *Surety Ins. Co. of California v. Williams*, 729 F.2d 581, 582–83 (8th Cir. 1984)). An attorney must have express authority to settle a case on a client's behalf. *Id.* at 646; *Turner v. Burlington Northern R.R. Co.*, 771 F.2d 341, 345 (8th Cir.1985).[4]

4. In *Kansas City Laborers Pension Fund v. Parmount Indus.*, 829 F.2d 644 (8th Cir.1987), the Eighth Circuit Court of Appeals noted that the "express authority" standard was established in *Turner v. Burlington Northern R.R. Co.*, 771 F.2d 341, 345 (8th Cir.1985), even though the court had previously established a less stringent standard of "actual, implied, or apparent authority" in *Surety Ins. Co. of California v. Williams*, 729 F.2d 581, 583 (8th Cir.1984). The *Turner* court cited *Thomas v. Colorado Trust Deed Funds, Inc.*, 366 F.2d 136, 139 (10th Cir.1966), for the standard instead of *Surety Ins. Co.*, *Turner v. Burlington Northern R.R. Co.*, 771 F.2d 341, 345 (8th Cir.1985). The court in *Kansas City Laborers Pension Fund* stated that it did not know why the *Turner* court had chosen the more stringent standard, but nonetheless applied the "express authority" standard. *Kansas City Laborers Pension Fund v. Parmount Indus.*, 829 F.2d 644, 646 n. 2 (8th Cir.1987).

In the present case, because the court concludes that attorney Zaiger had express authority to agree to the settlement of this suit on McEnany's behalf, the court will only address the issue of apparent authority here in the margin. The Eighth Circuit Court of Appeals recently reiterated the elements of apparent authority in *Millard Processing Services, Inc. v. N.L.R.B.*, 2 F.3d 258 (8th Cir.1993).

Apparent authority results from a manifestation by a principal to a third party that reasonably leads a third party to believe that another person is acting as the principal's agent. *NLRB v. Donkin's Inn, Inc.*, 532 F.2d 138, 141 (9th Cir.) (citing *Hawaiian Paradise Park Corp. v. Friendly Broadcasting Co.*, 414 F.2d 750, 756 (9th Cir.1969)), *cert. denied*, 429 U.S. 895, 97 S.Ct. 257, 50 L.Ed.2d 179 (1976); *Restatement (Second) of Agency* §§ 8, 27 (1958). The manifestations may consist of direct statements to the third party or of the granting of permission to the other person to do something which reasonably leads the third party to believe that that person has the authority to perform those acts. *Id.* To create apparent authority, the principal must either intend to cause the third party to believe that the agent is authorized to act for it, or should realize that its conduct is likely to create such a belief. *Restatement (Second) of Agency* § 27 cmt. a (1958). Only information actually communicated to and known by a third party can establish apparent authority. *Id.* § 27 cmt. b. *Millard Processing Services, Inc. v. N.L.R.B.*, 2 F.3d 258, 262 (8th Cir.1993). McEnany made several manifestations to the defendants and to the mediator sufficient to create Zaiger's apparent authority to settle this matter on her behalf. McEnany attended the mediation session in the company of her attorney, allowed him to address

An attorney's authority to settle a case can be created by written or spoken words or the conduct of the principal which, reasonably interpreted, causes an agent to believe that the principal desires the attorney to act in a particular manner on the principal's behalf. *Turner, supra,* at 345. Once it is shown, however, that an attorney has entered into an agreement to settle a case, the party who denies that the attorney was authorized to enter into the settlement has the burden to prove that authorization was not given. *Kansas City Laborers Pension Fund v. Parmount Indus.,* 829 F.2d 644, 646 (8th Cir. 1987) (citing *Turner, supra,* at 346). This is a heavy burden. *Id.*

■ The court finds that McEnany expressly created Zaiger's authority to settle the case in the final discussion with Zaiger and Pashler, the mediator, on the morning of June 17, 1993. When the final offer was being discussed, Zaiger informed McEnany that he did not believe that he could produce a better settlement of her claims. The testimony of Pashler and McEnany herself shows that McEnany then replied, "I guess I better do what my attorney says." McEnany then left the mediation session aware that her attorney, Pashler, and counsel for defendants were verifying the terms of the agreement.[5]

However, McEnany argues that her agreement to settle this case was coerced by her attorney, Zaiger, and by the mediator, Pashler. McEnany testified that both Zaiger and Pashler consistently ignored issues of significance to her and her attempts to inject those issues into the settlement discussions. Furthermore, she testified that she was coerced by threats from Zaiger and Pashler that they would withdraw from the case if McEnany did not go forward with settlement. McEnany testified that she feared being without counsel in the prosecution of her case. However, her testimony leads this court to believe that this alleged threat, if made, was made after she accepted the agreement (TR 177). She testified that Pashler's frequent statements that he would quit and go home if the parties did not continue to move toward settlement put additional pressure on her to accept settlement.

Pashler testified that McEnany's counsel was "firm," "directed," and "emphatic" with McEnany during the discussion of the final settlement offer, and that Pashler himself was "emphatic" on certain issues. McEnany testified that both her attorney and the mediator were "angry" with her. Pashler testified that Zaiger stated that he believed he could get a larger attorney fee award by going to trial, but that the settlement offer was "the best he could do" for McEnany herself. Pashler also admitted that he stated his intention to terminate the mediation if McEnany or the District were intractable on a certain issue or if he did not consider that movement towards settlement was possible.

The Eighth Circuit Court of Appeals has not been confronted with a case in which a party alleged that settlement was the result of coercion or undue pressure from the party's own attorney. However, other Circuit Courts of Appeal have. In *Macktal v. Secretary of Labor,* 923 F.2d 1150 (5th Cir.1991), the court considered the question of "wheth-

the defendants and the mediator outside of her presence, allowed him to conduct negotiations with the mediator, and eventually acceded to the settlement he had negotiated on her behalf in the presence of the mediator. McEnany should have realized that her conduct was likely to create a belief on the part of third parties that Zaiger had authority to settle the case on her behalf.

5. In finding that plaintiff agreed to settle by this language, the court has considered *Turner v. Burlington Northern R.R. Co.,* 771 F.2d 341, 345 (8th Cir.1985), in which the Eighth Circuit Court of Appeals held that "[r]easonable persons could differ as to whether [plaintiff's] statements and actions constituted an express authorization to his attorneys to accept [defendant's] settlement offer." In *Turner,* the plaintiff testified that he responded to his attorney's statement of the defendant's latest offer by saying, "I suppose I'm going to have to settle and I'll call you." *Id.* at 343. The attorney then entered into a settlement agreement. *Id.* The plaintiff refused to accept the settlement check, and the Eighth Circuit Court of Appeals refused to grant defendant judgment as a matter of law in defendant's action to enforce the settlement. *Id.* at 345.

The plaintiff's statement in *Turner* specifically stated that plaintiff would make further contact with his attorney concerning the settlement. In contrast, McEnany's statement reasonably authorized Zaiger to settle her case on the terms he had presented without indicating McEnany would make further contact to consummate the deal.

er arguments, even quite heated arguments, between a client and his attorney concerning the merits of settling voids the consent given by the client." *Macktal v. Secretary of Labor,* 923 F.2d 1150, 1157 (5th Cir.1991). In *Macktal,* the plaintiff alleged that his attorneys threatened to withdraw from representation and to charge the plaintiff $12,000 in fees if he did not consent to an oral settlement. *Id.* When the agreement was reduced to writing, the plaintiff refused to sign it. *Id.* The plaintiff alleged that because he refused to sign, his attorneys signed on his behalf, then used the written settlement to "bludgeon" him into signing two versions of a general release. *Id.* In administrative proceedings, the Secretary of Labor concluded that although the plaintiff had alleged serious misconduct on the part of his attorneys, the alleged coercion did not affect the validity of the plaintiff's consent to the agreement. *Id.* On appeal, the court held

> [c]onsidering the ethical duties of an attorney to his client, the client's right to seek new counsel, and the availability of a direct action against the attorney, the Secretary concluded that [the plaintiff], rather than [defendants], should bear the risk of his attorneys' alleged misconduct, and refused to void the settlement based on [the plaintiff's] allegations. We cannot say that this action constituted an abuse of discretion.

*Id.* at 1157–58.

In *Janneh v. GAF Corp.,* 887 F.2d 432 (2d Cir.1989), the Second Circuit Court of Appeals upheld settlement on the ground that the plaintiff's attorney had apparent authority to settle the case. *Janneh v. GAF Corp.,* 887 F.2d 432, 436 (2d Cir.1989). Following announcement by defendant's counsel to the court of a settlement agreement in an employment discrimination case, the plaintiff obtained new counsel and attacked the settlement. *Id.* at 434. The plaintiff did not deny signing a settlement letter agreement,

> but instead argued that the settlement should be set aside because he "signed the agreement under civil pressure": his former counsel, he claimed, told him that he did not have much of a case, thus "coercing" him to settle.

*Id.* In enforcing the settlement, the Second Circuit Court of Appeals relied in part on the decision of the United States Supreme Court in *Carson v. American Brands, Inc.,* 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981).

> In *Carson v. American Brands, Inc.,* the Supreme Court described the "serious consequences" of an order refusing to approve a consent decree in a Title VII case, namely, denying the parties "the opportunity to compromise their claim" and depriving them of "the benefits of the settlement agreement they negotiated." 450 U.S. 79, 89, 101 S.Ct. 993, 999, 67 L.Ed.2d 59 (1981).

*Id.* 887 F.2d at 435. The Second Circuit Court of Appeals found that the order of the district court concluding that "no settlement agreement was ever formed" would have the dire consequences described above. *Id.*

In the present case, the court does not believe that McEnany was "coerced" into agreeing to settlement. The serious, even heated discussions of the relative merits of settlement versus proceeding to trial, were indicative of Zaiger's professional judgment and opinion. However, it is clear from *Macktal* and *Janneh* that the decisive factor is not whether plaintiff now feels coerced into settlement; instead, the decisive factors are whether there was sufficient authority to enter into the agreement and whether the opposing party should be deprived of the benefits of the settlement agreement negotiated. The court has concluded that Zaiger had express authority to settle the case. The parties should not be deprived of the benefits of the settlement agreement on the ground that one of the parties now rejects it as inadequate, *Worthy, supra,* 756 F.2d at 1373, or as the product of coercion. *Macktal, supra; Janneh, supra.*

In addition to alleging coercion by her own attorney, McEnany makes the allegation that she was coerced into settlement by the mediator, or that, at the very least, the mediator suffered from a conflict of interest such that the entire mediation process was unfair. McEnany argues that she was coerced into settlement by Pashler's statement that he would stop the mediation and leave if he did not believe the parties were moving toward

settlement. This argument is ironic in light of her claim that no one was considering any of her demands that evening. McEnany also argues that she was coerced into settlement by the refusal to give her twenty-four hours to consider the final offer. Finally, McEnany argues that Pashler was biased by a conflict of interest resulting from his law firm's retention by the District for various legal services in 1993 and preceding years.

Pashler had no personal contact with any legal matters his firm may have handled on behalf of the District and had only learned of many of them just prior to the hearing held by this court on November 19, 1993.[6] Pashler had some prior contact with counsel for both the plaintiff and the defendants in a professional capacity, but never with either in a personal capacity. Pashler was known to both McEnany and defendant Swanson from lecture or seminar appearances, or other professional contact, but he did not know either of those parties personally. Pashler understood he had been chosen as a mutually acceptable mediator by counsel for both parties, and that he did not recall which attorney initially contacted him concerning mediation of this matter.

The court has located little precedent concerning the ethical standards for a mediator. However, the United States District Court for New York considered factually similar circumstances in *In re New York City Asbestos Litigation; In re Joint Eastern And Southern Districts Asbestos Litigation (Brooklyn Navy Yard Cases)*, 737 F.Supp. 735 (E.D. & S.D.N.Y.1990). In a joint opinion by a New York Supreme Court Justice and a United States District Judge, the court considered the claim of defendant Owens–Illinois, Inc., that Mr. Feinberg, the settlement master-referee, should be disqualified. *Id.* 736–37. Mr. Feinberg had been assigned by the court the task of "mediating between the parties to avoid the necessity of extended trials in cases involving asbestos exposure at the Brooklyn Navy Yard." *Id.* Although it had initially offered no objection to Mr. Feinberg's appointment, Owens–Illinois moved to disqualify the mediator because some years previously he and his law firm "had acted on

its behalf and that of other asbestos manufacturers in connection with public education and legislative efforts aimed at promoting alternative compensation systems to mass tort litigation." *Id.* The court denied the motion. *Id.*

The court concluded first that
[i]n general a special master or referee should be considered a judge for purposes of judicial ethics rules. *See Code of Judicial Conduct for United States Judges*, 69 F.R.D. 273, 286 (1975) (approved by Judicial Conference of the United States, April 1973 and amended) (Code of Judicial Conduct applicable to special masters); Standards Relating to Judicial Discipline and Disability Retirement, Rule 1.2, Comment (same). *Accord Belfiore v. New York Times Co.*, 826 F.2d 177, 185 (2d Cir.1987) (Code of Judicial Conduct For United States Judges applies to special masters), *cert. denied*, 484 U.S. 1067, 108 S.Ct. 1030, 98 L.Ed.2d 994 (1988).

*Id.* 737 F.Supp. at 739. The court then concluded that the applicable standard of conduct was as follows.

Under federal law, a judge may be disqualified in two situations that are relevant to the instant motion: 1) where "impartiality might reasonably be questioned," 28 U.S.C. § 455(a), and 2) where there is "a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." *Id.* § 455(b)(1). Section 455(a) "sets out an objective standard for recusal, creating the so-called 'appearance of justice' rule." *DeLuca v. Long Island Lighting Co.*, 862 F.2d 427, 428 (2d Cir.1988) (citation omitted).

The federal test of impartiality "is what a reasonable person, knowing and understanding all the facts and circumstances, would believe." *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1309 (2d Cir. 1988)....

With regard to § 455(b)(1), any "alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some

6. The Ahlers firm represents hundreds of school    districts in audits and on bond issues.

basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 16 L.Ed.2d 778, 86 S.Ct. 1698 (1966). *Accord People v. Moreno*, 70 N.Y.2d 403, 407, 521 N.Y.S.2d 663, 666, 516 N.E.2d 200, 202–03 (1987) (holding New York State judges to same disqualification standard) (citing *Grinnell*, 384 U.S. at 583, 86 S.Ct. at 1710)....

· In defining avoidance of the appearance of impropriety, Rule 100.3 states a judge should disqualify himself or herself "in a proceeding in which his or her impartiality might reasonably be questioned" including situations in which "the judge served as a lawyer in the matter in controversy...." The determination of impropriety in any given situation, however, remains within the discretion of the judge. *See People v. Moreno*, 70 N.Y.2d 403, 407, 521 N.Y.S.2d 663, 666, 516 N.E.2d 200 [202] (1987) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 16 L.Ed.2d 778, 86 S.Ct. 1698 [1710] (1966)); *Johnson v. Hornblass*, 93 A.D.2d 732, 461 N.Y.S.2d 277, 279 (1st Dep't 1983).

*Id.* 737 F.Supp. at 740–41. Finally, the court noted that special masters and mediators, unlike judges, "will often be chosen from the ranks of practicing attorneys who themselves have prior expertise in the subject matter and prior association with experts in the field," and that "[i]n light of this inevitability, the Court of Appeals for the Second Circuit has found as a "general 'rule that disqualification [of a special master or mediator] is a matter for the exercise of discretion by the district judge, unless actual bias has been demonstrated.'" *Id.* at 741–42 (citing *Rios v. Enterprise Ass'n of Steamfitters Local 638*, 860 F.2d 1168, 1174 (2d Cir.1988)). The court denied the motion for disqualification on the ground that Owens–Illinois had failed to show any adverse effect as the result of the mediator's prior contact with that defendant, and that it was "clear from the record that no reasonable lawyer or member of the public who understood the nature of the mediator's role or the facts relied upon by the moving party could possibly question the impartiality of Mr. Feinberg." *Id.*[7]

■ In the present case, the record reveals that everything Pashler learned about the dispute was gained during the mediation session, primarily from Zaiger's presentation of his case to the Board at the beginning of the mediation session. Pashler was unaware of and uninvolved in the specific contacts between his firm and the District upon which McEnany bases her allegations of conflict of interest. Furthermore, the evidence developed at the hearing on this matter did not demonstrate that Pashler's law firm actually undertook any specific activities on behalf of the District, apart from bond audits and reports, after their "approval" by the District. There is no basis for setting aside the settlement because of this alleged conflict of interest.

■ McEnany also attacks the fundamental fairness of the mediation session on the ground that attorney Gruhn improperly represented both the District and Swanson.[8] DR5–105 of the Code of Professional Responsibility governs when an attorney may properly represent two or more clients. A lawyer must not represent a client if to do so will be directly adverse to the interest of another client unless: (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) each client consents after consultation and disclosure of all relevant facts. DR5–105(A)–(C). Although concerned with proper conduct by all attorneys appearing before

---

7. A similar conclusion concerning alleged bias of PERB mediators was reached in *New York State Inspection, Security And Law Enforcement Employees v. The New York State Public Employment Relations Board*, 629 F.Supp. 33 (N.D.N.Y.1984). The court concluded that

the PERB members who adjudicated and reviewed the strike charge had gained their familiarity with the issues only through their role as mediators, or through their alleged contacts

with those who had mediated or negotiated. Under such circumstances, the potential for inherent bias is not "constitutionally intolerable," and the allegations of prior familiarity and involvement do not state a claim for relief. *Id.* at 41.

8. Despite this allegation of unethical conduct, plaintiff has never moved for disqualification of defense counsel.

this court, the court need not determine whether attorney Gruhn's representation of both the District and Swanson was proper because any prejudice of an improper joint representation, if found, would be to the District or Swanson, not to McEnany.

■ Finally, McEnany argues that there was "no meeting of the minds" such that an enforceable settlement agreement can be found. The court concludes below that the parties arrived at explicit terms in settlement of this matter. The court concludes that a settlement agreement was reached on the morning of June 17, 1993, and that McEnany is bound by that agreement. The court turns next to construction of the terms of that agreement.

## B. Terms Of The Settlement Agreement

■ An agreement to settle a legal dispute is a contract, and as such its interpretation is governed by familiar principles of contract law. *Devils Lake Sioux Tribe v. North Dakota*, 917 F.2d 1049, 1055 (8th Cir. 1990); *Amana Refrigeration v. Pidgeon's Furniture & Appliance Stores, Inc.*, 883 F.2d 657, 658 (8th Cir.1989) (applying same principle from Iowa law). The court's objective in interpreting a settlement agreement is to ascertain the actual intent of the parties at the time they executed it. *Id.; see also Worthy v. McKesson Corp.*, 756 F.2d 1370, 1372 (8th Cir.1985) ("Crucial to the construction of the settlement agreement is the intent of the parties"). Intent is a question of fact. *Worthy, supra,* at 1372. In construing an agreement, the court should endeavor to place itself in the position of the contracting parties and view the agreement in light of the facts and circumstances surrounding its execution. *Devils Lake Sioux Tribe, supra,* at 1055. If a claim is an issue in the lawsuit and the parties settle all disputed issues in the case, the claim is clearly within the scope of the settlement agreement. *Worthy, supra,* at 1373.

In the present case, the record reveals that the parties agreed to all material terms of a settlement of all claims on June 17, 1993, and that the agreement was later reduced to writing in Exhibit H.[9] The testimony of Pashler, Winkelmann (Attorney Gruhn's associate), and McEnany herself shows that McEnany agreed to a settlement on June 17, 1993, and that the terms of that agreement were embodied in the contemporaneous notes of the mediator and defendants' counsel, which corroborate each other. As in *Worthy*, it was only while counsel for both parties were attempting to reduce the agreement to writing that the plaintiff attempted to inject new and different terms into the settlement. *Worthy, supra,* at 1372–73. McEnany, having previously authorized settlement, cannot now change her mind because she now believes the settlement to be inadequate, but remains bound by the terms of the agreement. *Worthy, supra,* at 1373.

## ATTORNEY FEES

■ The defendants also seek an award of attorney fees incurred in their efforts to enforce the settlement agreement. A court has the inherent authority to assess attorney fees against a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. *Jaquette v. Black Hawk Cty., Iowa,* 710 F.2d 455, 462 (8th Cir.1983). Furthermore, a court has inherent authority to enforce a settlement agreement and that authority includes the power to award damages for failure to comply with the settlement agreement. *TNT Marketing, Inc. v. Agresti,* 796 F.2d 276, 278 (9th Cir.1986) (court awarded damages including over $10,000 in attorney fees). The court also notes that a prevailing defendant in a Title VII action may be awarded attorney fees, but only where the plaintiff's action was "unfounded, meritless, frivolous or vexatiously brought." *Christianburg Garment Co. v. EEOC,* 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978). "Meritless" should not be understood as meaning merely that the plaintiff

---

9. At the hearing, McEnany testified to many disagreements with the terms of the agreement as embodied in Exhibit G. However, her counsel also disagreed with Exhibit G. Exhibit H, including Zaiger's revisions to Exhibit G, removes nearly all of McEnany's objections to Exhibit G. Counsel for both parties agreed that Exhibit H embodied the terms of the agreement they reached on June 17, 1993. *See* Exhibit H and testimony of Mr. Winkelmann.

ultimately lost, but that the claim was groundless or without foundation. *Id.* A finding of subjective bad faith is not necessary. *Id.*

█ In the present case, although McEnany ultimately lost on her claims that the settlement agreement was unenforceable on grounds of coercion or fundamental unfairness of the process, the court does not find that her claims were so frivolous or unfounded as to warrant an award of attorney fees incurred by defendants in seeking to enforce the settlement agreement. The fact that the court ultimately found McEnany's grounds for attacking the settlement agreement insufficient does not amount to a finding that her claims were unfounded and vexatiously brought. The court is satisfied that enforcement of the settlement agreement is a sufficient exercise of the court's power to resolve this dispute.

Upon the foregoing,

IT IS ORDERED

1. That defendants' July 23, 1993, motion to dismiss or in the alternative to enforce a settlement agreement (docket number 21), amended November 19, 1993 (docket number 34), is granted to the extent that the court will enforce the settlement agreement between the parties reached on June 17, 1993, as embodied in written form in Exhibit H. Unless an appeal is filed, plaintiff shall sign a copy of Exhibit H within thirty (30) days of the date of this order or this action will be dismissed. Defendants' application for attorney fees is denied.

IT IS FURTHER ORDERED

2. That defendant's November 19, 1993 motion to quash subpoena (docket number 35) is granted.

3. That plaintiff's February 9, 1994 motion to extend time to file brief (docket number 42) is granted. Plaintiff's February 14, 1994 brief is deemed timely filed.