**IN THE COURT OF APPEALS OF IOWA**

No. 14-0211
Filed April 16, 2014

**IN THE INTEREST OF A.K. AND W.B.,**
**Minor Children,**

**S.B., Mother,**
**Appellant.**

_____

Appeal from the Iowa District Court for Woodbury County, Brian L. Michaelson, Associate Juvenile Judge.

A mother appeals the termination of her parental rights to two children. **AFFIRMED.**

Angela H. Kayl, Sioux City, for appellant mother.

Thomas J. Miller, Attorney General, Janet L. Hoffman, Assistant Attorney General, Patrick Jennings, County Attorney, and Loan Hensley, Assistant County Attorney, for appellee State.

Michelle M. Hynes of the Juvenile Law Center, Sioux City, for appellee father.

Jessica R. Noll of Deck Law, L.L.P., Sioux City, attorney and guardian ad litem for minor children.

Considered by Potterfield, P.J., and Doyle and Bower, JJ.

**POTTERFIELD, P.J.**

The mother[1] appeals the termination of her parental rights to her two children, A.K., age three at the time of termination, and W.B., age one. The mother contends (1) there is not clear and convincing evidence to justify termination under any of the four paragraphs of section 232.116(1) (2013) relied upon by the juvenile court, (2) termination is not in the children's best interests, (3) the closeness of the parent-child bond should preclude termination, (4) the State failed to make reasonable efforts to reunify the mother and children, (5) the court erred in, and the mother's due process rights were violated by, the quashing of the subpoenas served on Jeremy Kilberg, Alma Schmidt, and Tom Jorgensen, (6) the court erred in not allowing the family consultant to be impeached with a recording, and (7) the court erred in denying the mother's December 5, 2013, motion to continue and to remove the father's attorney. Many of the mother's claims were not raised in the juvenile court and are thus not properly before us. There is clear and convincing evidence that grounds for termination exist under section 232.116(1)(h), termination is in the children's best interests as it will allow for much needed permanency pursuant to section 232.116(2), and the bond between parent and child is not so close as to avoid termination under section 232.116(3). Moreover, the juvenile court did not abuse its discretion in its evidentiary rulings. We therefore affirm.

---

[1] The father's parental rights were also terminated. He does not appeal the termination of his rights and he has submitted a brief in support of the termination of the mother's parental rights.

**I. Background Facts and Proceedings.**

A.K. was born in November 2010 to the mother, S.B., and the father, K.K. In October 2011, the family came to the attention the department of human services (DHS) upon a report the father had "attacked [S.B.], in the presence of their child, [A.K.], age 11 months. It is reported that [the father] tried to choke [the mother], grabbed her wrist, causing bruising to her neck and wrist." The report also indicated both parents were using illegal substances.

A follow-up investigation indicated there was ongoing violence between the mother and father, the mother had a history of depression, the mother was twenty-two weeks pregnant with a second child and had not received any prenatal care, the mother and father were using illegal substances, and the child has been left with the maternal grandmother with the mother's whereabouts unknown. The grandmother indicated she did not have the resources to care for the child, which resulted in an emergency removal of A.K.

A hearing was held to review removal and determine if the child was to be adjudicated a child in need of assistance (CINA).[2] The December 5, 2011, order confirmed the removal and adjudicated A.K. CINA, stating in part:

> [A.K.] has been exposed to ongoing chaos, including violence and illegal drug usage. [A.K.] has parents who have a history of instability and acting erratically. [The mother] initially fled the area, requiring a bench warrant for her arrest, due to drug charges. Both parents have acknowledged the use of illegal drugs. As a result, the court finds that the removal of [A.K.] is necessary[.]

On January 30, 2012, a dispositional order was entered. The court noted A.K. was then residing with the mother in a residential program.[3] The mother

---

[2] The hearing did not take place until December because the mother had fled the area.

was ordered to participate in substance abuse treatment; Family Safety, Risk, and Permanency (FSRP) services; and a urinalysis protocol (UA). She was also to follow all recommendations of the service providers.

The mother began participating in Family Treatment Court on February 1, 2012, and participated in FSRP services—her family consultant was Felicia Wynn of Boys Town. February Boys Town progress reports indicate the mother was addressing her substance abuse issues at the residential program and was addressing her history of being in an abusive relationship with the father.

On May 1, 2012, a review hearing was held. In its May 11 review order, the juvenile court noted that the mother became "overwhelmed and began to struggle" when her child joined her at the residential program. The court indicated the mother was accepting of the recommendation to remain at the program pending an opening at Sanctuary Apartments, transitional housing. The court found the relationship between the parents "remain[ed] unclear."

W.B. was born in May 2012. About July 2012, the mother and children moved into a transitional apartment. A July 15, 2012 Family Treatment Court progress report indicated the mother was "overwhelmed" at times and had allowed the father to violate the visiting regulations. W.B. was adjudicated CINA on July 26, 2012.

A child protective assessment was initiated in August 2012 when it was reported that the mother had left the children home alone on August 29 at 11:50 p.m., met the father, got into an argument, and did not return to the children until 2:00 a.m. On August 31, 2012, a child protective worker spoke with the mother.

---

[3] The mother entered the Women & Children's program on December 7, 2011.

The mother acknowledged she had left the children sleeping to go purchase medicine. She had provided a downstairs' neighbor a baby monitor. She told the worker of her "volatile relationship with the children's father." When the investigator spoke with the father, he indicated he and the mother had pre-arranged to meet that night; he claimed the mother told him she had a babysitter. The incident resulted in a founded child abuse report against the mother with a finding of failure to provide proper supervision.

The mother and children returned to Women & Children's residential program on September 4, 2012. The results of a UA collected from the mother on September 30 were positive for amphetamines.

The State filed a motion to modify placement on October 2, 2012, and on October 24, the State filed an application for temporary removal in which it asserted the mother had relapsed on methamphetamine, and the mother had been asked to leave the residential program because she threatened another resident of the facility.

On October 31, the court found the children's removal was necessary "as the children are in imminent danger under the care of a parent who is using illegal drugs." The court found:

> 3. The underlying reasons for these adjudications were the children's exposure to their parents' drug usage coupled with a dysfunctional relationship between the children's parents marred by codependency/domestic violence issues.
> . . . .
> 6. The children cannot be placed with their father . . . who also continues to abuse drugs.
> 7. The children are now with the same foster family with whom [A.K.] had previously been placed.
> 8. [The father] is scheduled to enter inpatient treatment in the immediate future while [the mother], who is now involved in

intensive outpatient treatment, will likely enter inpatient treatment following [the father's] discharge from the same inpatient program at the Synergy Center.

9. [The mother] is also on probation as a result of her conviction for ingestion/possession of drugs in the state of South Dakota. Due to her positive UA it is likely that her probation officer will be requesting a revocation of her probation.

10. Reasonable efforts have been made to prevent the need for this removal.

The juvenile court noted that both parents requested that the court consider relative care placement. The court stated it would address the issue at the time of the November 7, 2012, hearing on the State's motion for modification.

On November 5, 2012, the maternal grandparents filed a petition to intervene in the juvenile court proceedings. At the time set for the modification hearing, the mother was incarcerated in South Dakota for a probation violation, and the father was not present because he was undergoing inpatient treatment. The court rescheduled the State's motion to modify and ordered it be heard at the same time as the petition to intervene.

The hearing was held on November 13, 2012, and on November 28, the juvenile court found the mother was still in jail, and the father had relapsed and was in inpatient treatment. The court noted the mother intended to enter inpatient treatment upon her release from jail. The court observed that the relationship between the parents "continues to be marred by codependency issues." It continued:

Both sets of grandparents underwent relative home studies when the children were first removed from parental custody in October 2011. While both sets of grandparents' homes were approved as viable placements for the children (see exhibits 73 and 74), a number of concerns have arisen since the completion of the relative home studies. These concerns include the maternal grandfather's knowledge of drug dealers in the area; the maternal

grandfather's dealings with the Drug Enforcement Agency and Sioux City Police Department as an informant in the sales of narcotics; the fact that the maternal grandfather has an active warrant for his arrest in the State of California as a result of a drug charge; the paternal grandfather's denial of any criminal history during the home study when, in fact, he has had three OWI convictions, a criminal mischief charge, an aggravated domestic violence incident involving a recent fight between the children's father and himself; the enmeshment between the grandparents and the parents; and the strained relationship between the maternal and paternal families, which has continued since court intervention over a year ago. (See Exhibits 4 and 15).

. . . .

While the current dispositional order of the court places custody of [A.K.] with her mother, she is, once again, in family foster care, as is her younger brother, [W.B.], due to the relapse of both parents back into the use of drugs. Clearly, neither of these children can be protected from harms which would justify their adjudication as Children in Need of Assistance if they were to be returned to the custody of either parent at this time. The parents' return to drug usage is a material and substantial change in circumstances which requires a change in the dispositional order for [A.K.] and entry of a dispositional order for [W.B], transferring custody of both children to the Iowa Department of Human Services for purposes of an out-of-home placement. Cleary, reasonable efforts have been made to prevent the need for this out-of-home placement.

While neither parent is contesting a dispositional order which provides for an out-of-home placement of these children, [the mother] argues that the children should be placed with the children's maternal grandparents while [the father] argues that they should remain in family foster care. If, pursuant to Iowa Code section 232.102, the court orders a transfer of custody of the children to the Department of Human Services, the children are to be placed in the least restrictive, most family-like, and most appropriate setting available and in close proximity to the parents' home consistent with the children's best interest and special needs. Iowa Code [§] 232.102(7) [(2011)]. In other words, when a child is removed from the control of the child's parents, the court shall secure for the child care as nearly as possible equivalent to that which should have been given by the parents. Iowa Code § 232.1.

. . . .

As noted above, [A.K.] is, once again, in the same foster home she had been placed a year ago only to be joined by her brother, [W.B.] The children are doing well in this placement while reunification efforts are ongoing. To place these children in the home of either the maternal or paternal grandparents would, in the

opinion of this court, not be in their best interest. As noted in the Findings of Fact above, there are a number of valid concerns which have been raised by the Department and the children's guardian ad litem/attorney with regards to the appropriateness of either relative placement at this time while reunification efforts continue.

The court also denied the maternal grandparents' petition to intervene. The grandparents did not appeal the ruling.

A permanency hearing was held on February 13, 2013. The court found the father had been attending outpatient treatment, participating in FSRP services, attending supervised visits with the children, and was employed full-time. The court found the mother entered inpatient treatment following her incarceration and was successfully discharged on December 31, 2012. She had moved into a halfway house, and had been participating in services and visitations with the children. The juvenile court granted the parents an additional six months to participate in reunification services.

The progress report entry dated April 29, 2013, indicates the mother was struggling with her new housing situation and she was worried about how she was going to pay her bills. The mother told the family consultant that she and the father had been having more contact and she was considering getting back together with him. The May 22 entry noted the mother had been "back and forth" about being with the father and that indecision made it difficult for service providers to provide proper services. The mother stated she wanted to be with the father and "want[ed] help with making the relationship healthy." The report later indicated the father had been living with the mother at her house.

The May 30 family team meeting notes indicate the mother had completed inpatient treatment and the halfway house program, and had begun parent child

interactive therapy (PCIT) with her daughter. Concerns were noted, including that there were rumors of both parents drinking and the parents' "relationship still involves anger and screaming." The family team notes also state the mother had not been taking advantage of the once a week phone call with her children.

In June, the father relapsed and was back in intensive outpatient treatment. He was now living with his parents. The June 28, 2013, progress report noted the children were doing well in the foster home and appeared to have a strong bond with the foster family.

A permanency review hearing was to be held on July 17, 2013. However, the parties informed the court the issue would be contested and the State intended to file a petition for termination of parental rights. The court ordered the permanency review hearing continued and set discovery deadlines.

A July 23, 2013, Family Treatment Court progress report noted the mother had "some insight" about her male dependency issues. Further, the report states, in part, that the mother

> is able to identify how her addiction and co-dependency have been making decisions for her throughout her recovery that she is not ok with. She is finally gaining an understanding of how sick she is with her co-dependency and has obtained a temporary CODA [Co-Dependency Anonymous] sponsor. . . . She continues to consistently attend groups and individual sessions and is being more honest about her unhealthy relationship with men.

The family consultant's weekly progress report of July 23 noted the mother's dishonesty about contact with the father and "events that led up to police contact." The August 4 weekly report noted the mother was not attending her CODA meetings and had failed to contact the FSRP family consultant for "the past couple weeks."

On August 12, 2013, a petition for termination of parental rights was filed.

On August 28, the mother filed a motion to increase visitation. The motion asserted the mother was then receiving two hours a week of supervised visits and that she was doing what was expected of her. She asked that the court allow more and unsupervised visitation. The State, joined by the guardian ad litem (GAL), filed a resistance to the motion. The court set the motion for a hearing on September 4.

On September 6, the juvenile court entered an order in which it made the following findings:

> 6. . . . [The father] was discharged from Family Treatment Court on July 17, 2013 due to noncompliance.
>
> 7. [The mother] has been involved in co-dependency treatment for well over a year. Notwithstanding her statements on several occasions that her relationship with [the father] was over, they have continued to have a great deal of contact. In fact, [the father] lived in [the mother's] residence during the month of May. [The mother], whose credibility is highly questionable, did not share the living relationship with anyone. It was discovered during a family team meeting on May 30, 2013, when the paternal grandmother reported that [the father] had been living in [the mother]'s home. [The father] acknowledged that he had been living there and self-reported continued alcohol consumption. He further reported that he had drunk with [the mother] on multiple occasions. On July 5, 2013, [the mother] reported two separate verbal and physical altercations between [the father] and herself, one of which occurred at approximately 1:30 a.m. when [the father] was intoxicated (see Exhibit 131). On July 8, 2013, [the father] and [the mother] were observed by the DHS case manager walking together in downtown Sioux City.
>
> 8. Following a third police report in July which involved a disagreement between [the father] and others at [the mother]'s home, where weapons were involved, the Department of Human Services reduced the amount of visitation time [the mother] was having with the children.
>
> 9. [The mother] has been involved in PCIT [(Parent-Child Interaction Therapy)] with [A.K.] since mid-May. The first PCIT appointment was on May 23, 2013. There have now been 12

sessions. The PCIT was initiated due to issues [the mother] was having over the control of [A.K.]'s behaviors.

10. [The mother]'s visitations with [A.K.] and [W.B.] had been increasing up until the discovery of her ongoing relationship with [the father], with the resulting police reports and chaos in early-July. She had been having an overnight visitation every Wednesday at the home of her parents, with this visitation being supervised by her parents along with a drop-in from the family consultant from Boys Town.

11. Since the incidents in early-July, the visits were decreased to two supervised parent-child interaction hours per week. One hour is now supervised by the family consultant from Boys Town at the maternal grandparents' home, while the other hour occurs during the weekly PCIT sessions.

12. The family consultant reports that the maternal grandparents have been videotaping sessions and that [the mother] has attempted to purposely upset [A.K.] at the end of visitations to make it appear as though [A.K.] was upset because the visit was ending.

The court further found that the children's behaviors had improved since the mother's visitations were reduced. The court denied the mother's motion for increased visitation.

On September 23—the date scheduled for the permanency hearing and termination trial—the mother moved to have the GAL removed because the foster parents had been providing day care for the GAL's child. The mother also moved to have the FSRP family consultant removed because she had known the foster parents were providing care for the GAL's child. The GAL acknowledged the foster parents had been providing day care for her son since mid-August, but stated she did not believe that her judgment would be affected by that relationship. The juvenile court found the relationship raised an appearance of impropriety "even though the court did not believe the [GAL's] judgment would

likely be affected." The court appointed a new GAL[4] and continued the hearing/trial. The court denied the motion to remove the family consultant.

On October 30, 2013, the State filed a motion to quash a subpoena, which had been served on DHS social worker Tom Jorgensen on October 28 to appear at a deposition on October 31.

On November 1, 2013, the mother filed a motion to modify the placement of the children, asking that they be placed with the maternal grandparents.

The permanency hearing/termination trial began on November 5, 2013. The mother acknowledged that the court became involved with her family due to her substance abuse and the parents' domestic violence and co-dependency. She acknowledged the father had lived with her for about two weeks in May and that she had not informed case workers. She denied drinking and denied seeing the father drink when he lived with her. She acknowledged she had not moved beyond supervised visits with her children. The mother testified she was currently receiving two hours of supervised visits per week—one hour with both children, and the second hour was with A.K. in PCIT. The mother stated she was, in the last three months, "finally . . . working on my codependency and getting help from that."

The father testified he lived with the mother until mid-June. He stated that he and the mother were dishonest about the relationship because "she was scared it would jeopardize us getting our kids." He acknowledged he had

---

[4] Unfortunately, the GAL appointed had a conflict of interest, as did the next appointed GAL. On October 8, 2013, the juvenile court appointed Jessica Noll to represent the children.

relapsed at least five times during the proceedings and testified he and the mother drank together while he lived at her apartment.

The family's DHS social worker, Tom Jorgensen, testified on November 5 and 8. Jorgensen was extensively questioned by the mother's attorney about whether he had followed proper protocols in 2011 and 2012 regarding placement of A.K. with the maternal grandparents and why he did not do more to encourage the maternal grandparents to complete the process that would allow the children to be placed with them. The State objected, noting the issues had been litigated previously and there had been no appeal.

Jorgensen recommended termination of the mother's parental rights due to ongoing concerns with the mother volatile relationship between the parents, and the mother's sobriety and codependency. He opined that the mother's lack of honesty with regard to her substance abuse created a risk to her ability to parent. He also testified the mother struggled to be able to divide her attention and to provide care for both children (especially as she had difficulty managing A.K.'s tantrum behaviors). He observed DHS had never recommended unsupervised visits because "there had not been a consistent demonstration of being able to provide a safe, stable environment for the children without that safety net of somebody else there to watch over those interactions."

Jorgensen testified the maternal grandparents were unable to maintain appropriate boundaries with the mother and that they had often blamed the father for the family's involvement in juvenile court proceedings. Jorgensen testified he did not believe the maternal grandparents were a suitable placement for the children:

> Because all of the concerns that I have had throughout the last two years in my opinion still remain in place with regards to [the maternal grandfather's] criminal history, his involvement with the DEA, as well as the relationship between [the mother] and her parents, their ability to set boundaries and keep those children safe.

Jorgensen testified the children were comfortable in the foster home, which is a safe, family-like setting for them. He also testified there were no additional services asked for by the parents. Nor were there additional services available that could be provided in the goal of reunification.

On November 8, the maternal grandparents filed a second motion to intervene. Additional testimony was submitted on that same date, as well as on November 14.

On November 14, the mother filed two motions to compel and request for sanctions, asserting Alma Schmitt of DHS had not produced the children's adoption file as demanded by a subpoena served on November 11, nor had Jorgensen produced documents about which he had testified on November 5.

On November 15, the State served a subpoena on the mother's attorney directing her to produce video and audio recordings of visits about which the mother had testified.

The juvenile court gave all the parties until the end of the business day on November 18, to respond to the mother's motions to compel. The State, the father, and the GAL resisted the motions. That same afternoon, the mother served additional subpoenas on Ms. Schmitt and Mr. Jorgensen.

A hearing on all pending motions was held on November 20. On November 26, the court explained:

2. On September 23, 2013, the permanency review/modification/termination of parental rights hearing was continued due to the removal of the children's guardian ad litem/attorney. The permanency review/modification/termination of parental rights hearing was continued until 9:00 a.m. on November 5, 2013. In the September 23, 2013 order of continuance, the parties were directed to file supplemental witness lists and proposed exhibits no later than October 30, 2013.

3. The permanency review/modification/termination of parental rights hearing was convened on November 5, 2013. Evidence was presented on November 5, November 8, and November 14, 2013. The hearing is set to reconvene on December 5, 2013.

4. Alma Schmitt was not listed as a witness by any of the parties.

5. A subpoena duces tecum was served on Alma Schmitt, a Department of Human Services employee, on November 11, 2013 (a federal and state holiday) at 3:02 p.m. and was not filed with the court until November 12, 2013 at 1:50 p.m. A Motion to Compel and Request for Sanctions were filed on November 14, 2013 by the attorney for the mother. The parties seek to quash the subpoena duces tecum and resist the Motion to Compel on eight grounds: (1) failure to allow a reasonable time to comply, (2) failure to properly provide notice to all parties, (3) failure to comply with Iowa Rule of Civil Procedure 1.1701(1)(a)(4), (4) the information is protected as trial preparation materials, (5) the request is untimely, (6) the request imposes an undue burden, (7) the request seeks cumulative evidence, and (8) the request is an abuse of the subpoena process.

. . . .

6. A subpoena duces tecum was served on Tom Jorgenson, a Department of Human Services employee, on October 31, 2013, and was filed with the court on November 2, 2013 at 3:19 p.m. Mr. Jorgenson was ordered to appear for a deposition and produce "the warrant from California on [maternal grandfather]" on Tuesday, November 5, 2013 at 9:00 a.m. (the first day of the termination proceedings). A Motion to Compel and Request for Sanctions was filed on November 15, 2013 by the attorney for the mother. The parties seek to quash the subpoena duces tecum and resist the Motion to Compel on four grounds: (1) failure to properly provide notice to all parties, (2) failure to properly serve the subpoena duces tecum, (3) the request seeks information not in the possession, custody, or control of the named individual, and (4) the request is an abuse of the subpoena process.

. . . .

7. A subpoena duces tecum was served on Angela Kayl, attorney for mother, on November 15, 2013, at 9:30 a.m. and was

not filed with the court until November 18, 2013, at 3:30 p.m. Ms. Kayl was ordered to produce "any and all digital audio and video recordings of [the mother] her children . . . during visits from August 1, 2013, to November 14, 2013" on Wednesday, November 20, 2013, at 12:00 p.m. Attorney for mother seeks to quash the subpoena duces tecum on the following grounds: (1) failure to comply with Iowa Rule of Civil Procedure 1.1701(1)(a)(4), and (2) the request is untimely.

. . . .

8. A subpoena duces tecum was served on a secretary in the Woodbury County Attorney's Office, a Woodbury County Attorney employee, which has not been filed with the court to date. The subpoena duces tecum ordered Loan Hensley to produce and permit inspection and copying of "any and all documents you have in regards to the California warrant and for [maternal grandfather], including but not limited to the warrant itself [and] . . . any and all documents regarding background checks for [the maternal grandparents]" on Wednesday, November 20, 2013 at 9:00 a.m. Attorney for the State seeks to quash the subpoena duces tecum on the following grounds: (1) failure to properly serve the subpoena duces tecum, and (2) the request seeks protected information.

At the November 20 hearing, the court cautioned the parties "that the actions taken in this case were approaching an abuse of process." In its thorough and detailed order, the court quashed all the subpoenas on several grounds and denied the motions to compel and for sanctions.

On November 25, the maternal grandparents filed an application for guardianship, which was resisted by the State, the father, and the GAL.

On December 2, 2013, the State filed a motion to quash additional subpoenas the mother served on Jeremy and Courtney Kilberg.

The permanency hearing/termination trial resumed on December 5. The court asked the mother's attorney who the Kilbergs were and why they were subpoenaed. The mother's attorney stated they "were friends on Facebook" with the foster mother and "it depends on what the foster parent's going to testify today." The court quashed the subpoenas on grounds they were "untimely" and

"a fishing expedition." During the mother's questioning of the foster mother, it was brought out that the father's court-appointed attorney also represented one of the foster mother's children.[5] That child had been in an institution and out of the foster parents' home for about three years. The mother moved to have the father's attorney removed, the case dismissed, and her children placed with her parents. The father informed the court he was aware his attorney represented the child and he had consented to continued representation by the attorney. The court denied the mother's motions and the trial continued.

On February 5, 2014, the juvenile court terminated the mother's parental rights pursuant to Iowa Code section 232.116(1)(d), (h), (i) and (*l*) (2013).[6] The

---

[5] The foster parents had six children: three biological children and three adopted. The child at issue had been adopted; but, he had been placed outside of the home at the parents' request due to his behaviors.

[6] Section 232.116(1) allows the juvenile court to terminate parental rights on any of the following grounds:

>   (d) The court finds that both of the following have occurred:
>
>   (1) The court has previously adjudicated the child to be a child in need of assistance after finding the child to have been physically or sexually abused or neglected as the result of the acts or omissions of one or both parents, or the court has previously adjudicated a child who is a member of the same family to be a child in need of assistance after such a finding.
>
>   (2) Subsequent to the child in need of assistance adjudication, the parents were offered or received services to correct the circumstance which led to the adjudication, and the circumstance continues to exist despite the offer or receipt of services.
>
>        . . . .
>   (h) The court finds that all of the following have occurred:
>
>   (1) The child is three years of age or younger.
>
>   (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
>
>   (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
>
>   (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

court also denied a pending motion filed by the State for sanctions, and denied the mother's motion to modify placement.

On appeal, the mother contends (1) there is not clear and convincing evidence to justify termination under any of the four paragraphs of section 232.116(1) relied upon by the juvenile court, (2) termination is not in the children's statutory best interests, (3) the closeness of the parent-child bond should preclude termination, (4) the State failed to make reasonable efforts to reunify the mother and children, (5) the court erred in, and the mother's due process rights were violated by, the quashing of the subpoenas served on Jeremy Kilberg, Alma Schmidt, and Tom Jorgensen, (6) the court erred in not allowing the family consultant to be impeached with a recording, and (7) the court erred in denying the mother's December 5, 2013, motion to continue and to remove the father's attorney.

---

(i) The court finds that all of the following have occurred:

(1) The child meets the definition of child in need of assistance based on a finding of physical or sexual abuse or neglect as a result of the acts or omissions of one or both parents.

(2) There is clear and convincing evidence that the abuse or neglect posed a significant risk to the life of the child or constituted imminent danger to the child.

(3) There is clear and convincing evidence that the offer or receipt of services would not correct the conditions which led to the abuse or neglect of the child within a reasonable period of time.

. . . .

(*l*) The court finds that all of the following have occurred:

(1) The child has been adjudicated a child in need of assistance pursuant to section 232.96 and custody has been transferred from the child's parents for placement pursuant to section 232.102.

(2) The parent has a severe substance-related disorder and presents a danger to self or others as evidenced by prior acts.

(3) There is clear and convincing evidence that the parent's prognosis indicates that the child will not be able to be returned to the custody of the parent within a reasonable period of time considering the child's age and need for a permanent home.

## II. Standard of Review.

We conduct a de novo review of termination of parental rights proceedings. *In re H.S.*, 805 N.W.2d 737, 745 (Iowa 2011). Although we are not bound by the juvenile court's findings of fact, we do give them weight, especially in assessing the credibility of witnesses. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010).

## III. Analysis.

*A. Clear and convincing evidence for termination.* The mother first argues grounds for termination do not exist. We disagree.

When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the juvenile court's order on any ground we find supported by the record. *Id.* at 707. Under Iowa Code section 232.116(1)(h), the court may terminate the rights of a parent to a child if: (1) the child is three years old or younger, (2) the child has been adjudicated a CINA under section 232.96, (3) the child has been out of the parent's custody for at least six of the last twelve months, and (4) "[t]here is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time." *See id.* Evidence is "clear and convincing" if no "serious or substantial doubts" exist as to the legal conclusions that can be drawn from it. *Id.* at 706.

At the time of termination, both children were three years or younger and had been adjudicated CINA. They had been out of the mother's custody for more than a year and could not be placed in her custody safely. Concerns about her sobriety and co-dependency in a turbulent relationship continued. Moreover,

the mother had been already been granted an additional six months to work toward reunification following the February 13, 2013, permanency hearing.

"[O]ur legislature has carefully constructed a time frame to provide a balance between the parent's efforts and the child's long-term best interests." *Id.* at 707. "Ultimately, the issue is not parental culpability but whether the statutory requirements have been met." *In re A.M.*, 843 N.W.2d 100, 111 n.9 (Iowa 2014). The DHS caseworker, all the service providers, and the GAL recommended termination. *See id.* at 111. The record indicates that after two years of services, the mother was still receiving supervised visits and was not in a position to care for her children without ongoing DHS involvement.[7]

We are mindful the mother appeared to be making some progress in the months preceding the termination trial. Yet concerns remained about her ability to parent the children safely. "A parent cannot wait until the eve of termination, after the statutory time periods for reunification have expired, to begin to express an interest in parenting." *In re C.B.*, 611 N.W.2d 489, 494 (Iowa 2000).

***B. Termination is in the children's best interests.*** "Even after we have determined that statutory grounds for termination exist, we must still determine whether termination is in the children's best interests." *In re A.B.*, 815 N.W.2d

---

[7] In *A.M.*, the court stated:

> We agree with the court of appeals majority that some of the individual incidents cited by DHS may seem trivial and other concerns may appear to be nebulous. Yet this evidence needs to be put in the appropriate context. The only opportunity for evaluating [the parents'] parenting came during the supervised and semisupervised visits, because the couple never progressed to a trial period with A.M. at home. Thus, inferences had to be drawn as to how safe A.M. would be with [the parents] based upon limited data points.

843 N.W.2d at 112.

764, 776 (Iowa 2012); *accord* Iowa Code § 232.116(2). We "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2); *accord In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). "It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *Id.*

"[O]ur legislature has carefully constructed a time frame to provide a balance between the parent's efforts and the child's long-term best interests." *D.W.*, 791 N.W.2d at 707. "The legislature adopted the standard in the belief that this period must be reasonably limited because, 'beyond the parameters of chapter 232, patience with parents can soon translate into intolerable hardship for their children.'" *In re J.E.*, 723 N.W.2d 793, 800 (Iowa 2006) (citation omitted). Here, the statutory time period has long passed and the mother has made only minimal progress. The mother is not able to provide for the children's long-term nurturing and growth. The children are in a foster-to-adopt placement. It is in the children's best interests to terminate the parent-child relationship so that they will have the opportunity to grow and mature in a safe, healthy and stimulating environment, free from drug activity, family dysfunction, and chaos. *See A.M.*, 843 N.W.2d at 113 (citing *J.E.*, 723 N.W.2d at 802 (Cady, J., concurring specially) (noting the "defining elements in a child's best interest" are the child's safety and her "need for a permanent home")).

***C. Potential ground not to terminate.*** Section 232.116(3) provides that "[t]he court need not terminate the relationship between the parent and child" under certain circumstances. "A finding under subsection 3 allows the court not to terminate." *Id.* at 113. But the "'factors weighing against termination in section 232.116(3) are permissive, not mandatory,' and the court may use its discretion, 'based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in this section to save the parent-child relationship.'" *Id.* (quoting *In re D.S.*, 806 N.W.2d 458, 474–75 (Iowa Ct. App. 2011)). The court has discretion, based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in this section to save the parent-child relationship. *In re C.L.H.*, 500 N.W.2d 449, 454 (Iowa Ct. App. 1993) (overruled on other grounds by *P.L.*, 778 N.W.2d at 39).

Section 232.116(3)(c) allows the juvenile court not to terminate when "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." We are not persuaded this is such a case.

It is clear the mother loves her children and that the children recognize her and can enjoy her company. But the children have been out of her custody for over a year (W.B. was only in her care from May to October 2012). A.K. has seen her mother for only two hours per week since July 2013—one hour in supervised visit and the other hour in PCIT; W.B.'s interaction with his mother is one hour per week. Under these circumstances, we cannot maintain a relationship where there exists only a possibility the mother will become a responsible parent sometime in the unknown future. Even assuming A.K. and

W.B. have a bond with their mother, it is not such a close relationship that we would place them in further limbo.

*D. Reasonable efforts at reunification have been made.* The mother next argues that DHS did not make reasonable efforts to reunify her with her children. She focuses primarily on allegations that the State did not adequately pursue placement with the maternal grandparents and that the foster mother did not support reunification.[8] The record shows otherwise. As found by the trial court, the mother has "been offered/provided with a myriad of services over the past two years to correct the circumstances which led to the adjudications of [her] children. Despite the offer/receipt of those services, [A.K.] and [W.B.] have not been returned to the custody of" their mother and "[t]here are no further services that can be provided that would allow for the safe return of these two children."

*E. The trial court did not abuse its discretion in quashing subpoenas.[9]* The mother next complains the court erred in quashing the subpoenas served upon Jeremy Kilberg, Tom Jorgensen, and Alma Schmidt. The district court has wide discretion in ruling on a motion to quash. *Morris v. Morris*, 383 N.W.2d 527, 529 (Iowa 1986). An abuse of discretion occurs when the trial court exercises its discretion on grounds or for reasons clearly untenable

---

[8] Placement with relatives was considered in 2012 and rejected. There was no appeal from the court's dispositional ruling or the denial of the maternal grandparents' intervention request. Those issues are not properly before us.

[9] We will not address the mother's claims—made for the first time on appeal—that her due process rights were violated by the trial court's quashing of the subpoenas. *See In re A.B.* 815 N.W.2d 764, 773 (Iowa 2012) (noting even issues implicating constitutional rights must be presented to and ruled upon by the trial court to preserve error for appeal). The mother also asserts the court was without jurisdiction to rule on the motion to quash the Kilberg subpoena because the State did not represent Kilberg and could not assert his rights. This claim, too, was not made in the district court and is not properly preserved. *See id.*

or to an extent clearly unreasonable. *In re Estate of Rutter*, 633 N.W.2d 740, 745 (Iowa 2001). A ground or reason is untenable when it is not supported by substantial evidence or is based on an erroneous application of the law. *Id.*

As we already noted, the district court quashed the Kilberg subpoena as untimely and a "fishing expedition." The mother contends the subpoena to Kilberg was not untimely. We find no abuse of discretion. The mother does not explain what relevant evidence Kilberg would have brought to the court.

With respect to the subpoenas issued to Alma Schmidt and Tom Jorgenson, we again find no abuse of the court's discretion. The district court quashed the subpoenas on several grounds, including that the mother failed to properly notify all the parties, did not include required language, and did not provide adequate time to respond—all of which could properly be considered by the court. *See* Iowa R. Civ. Proc. 1.1701. Moreover, some of the documents requested of Jorgensen were not in his possession. Upon our review, we find no abuse of discretion in quashing the subpoenas.

*F. The court did not abuse its discretion in not allowing the use of a recorded conversation.* The mother states she "requested to play a recording to impeach the family consultant, Ms. Wynn." At trial, the mother stated she wished to play the recording because Ms. Wynn was "saying she doesn't recall, so I'm saying I have a recording of that day, and I would like to play it." The State, the GAL, and the father's attorneys all objected on grounds they had no notice any recordings of visits had been made, no recordings were listed on the exhibit list, and no foundation had been laid. The court sustained the objection, but allowed the mother to treat Ms. Wynn as an adverse witness. We find no

abuse of discretion.[10]  *See* Iowa R. Prof'l Conduct 32:1.7; *In re E.H. III*, 578 N.W.2d 243, 245 (Iowa 1998) ("Evidentiary rulings are reviewed for an abuse of discretion.").

***G. The court did not abuse its discretion in denying the motion to continue trial and to remove the father's attorney.***  On the last day of the termination trial, the mother moved to have the father's attorney removed from the case, asserting there was a conflict of interest in that attorney representing the father and the foster mother's institutionalized child.  Any claim of conflict of interest belonged to the father, not the mother.[11]  *See McEnany v. W. Delaware Cnty. Cmty. Sch. Dist.*, 844 F. Supp. 523, 533-34 (N.D. Iowa 1994) (discussing

---

[10] Again, we do not address the mother's present contention, not made at trial, that the ruling violated her due process rights.

[11] The mother cites to Iowa Rule of Professional Conduct 32:1.9, which provides that an attorney shall not represent another person "in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client."  The rule is not applicable to the circumstances.

The rule related to conflicts of interests is 32:1.7, which provides:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if:

    (1) the representation of one client will be directly adverse to another client; or

    (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

    (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

    (2) the representation is not prohibited by law;

    (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

    (4) each affected client gives informed consent, confirmed in writing.

    (c) In no event shall a lawyer represent both parties in dissolution of marriage proceedings.

former Code of Professional Responsibility DR 5-105 and noting any prejudice of an improper joint representation belongs to those represented).

**IV.  Conclusion.**

There is clear and convincing evidence that grounds for termination exist under section 232.116(1)(h), termination of parental rights is in the children's best interests pursuant to section 232.116(2), and no consequential factor weighing against termination in section 232.116(3) requires a different conclusion.  We affirm termination of the mother's parental rights.

**AFFIRMED.**